IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| J.T. SUMMERS, A MINOR, ) <br> THROUGH HIS PARENTS ) <br> AND GUARDIANS, ) <br> ROBIN SUMMERS AND LEIGHANN SUMMERS ) <br> ) <br> ) <br>      PLAINTIFFS. ) <br> ) <br> vs. ) <br> ) <br> SMITH COUNTY BOARD OF ) <br> EDUCATION; BARRY SMITH, ) <br> IN HIS INDIVIDUAL CAPACITY; AND ) <br> MAC PETTY, IN HIS INDIVIDUAL CAPACITY ) <br> ) <br>      DEFENDANT(S). ) | No. _____ <br> JURY DEMANDED |

# COMPLAINT

**COMES THE PLAINTIFF, J.T. SUMMERS**, through his parents, ROBIN SUMMERS AND LEIGHANN SUMMERS, and counsel, submitting this Complaint and showing:

## I.    PARTIES, JURISDICTION, AND VENUE

1. This civil rights action arises from the unconstitutional expulsion of Plaintiff JT Summers, a sophomore high school student, based on an off-campus Instagram post that was neither a true threat nor otherwise unprotected by the First Amendment.

2. The Plaintiff is J.T. Summers who is a citizen and resident of Smith County. He is a minor, represented by and through his parents, Robin, his father, and Leighann, his mother, also residents of Smith County.

3. The Defendant, Smith County Board of Education, is a governmental entity organized under the laws of the state of Tennessee, providing public education to students of Smith County. It receives federal funds. It has the power to sue and be sued, and it is responsible for prescribing and enforcing rules and regulations at all school systems. It is authorized to delegate tasks to its Director of Schools.

4. The Defendant, Barry Smith, is the Director of Schools for Smith County and suit is brought against him in his individual capacity.

5. The Defendant, Mac Petty, is the Principal at Gordonsville High School and suit is brought against him in his individual capacity.

6. This action arises under the United States Constitution, 42 U.S.C. §1983, the First Amendment, and the Equal Protection Clause. The Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331.

7. Venue is appropriate in this Court under 28 U.S.C. §1391(b) as the cause of action arose in Smith County and the Defendant may be found in Smith County.

## II. FACTS

### *The Rivalry*

8. Gordonsville High School, the "Tigers," and Carthage's Smith County High, the "Owls," sit less than ten miles apart. The Tigers v. Owls crosstown rivalry is big in Smith County; friends and families are briefly divided in their loyalties, many having grown up together and attended opposite high schools.

9. The annual gridiron contest is "the Battle for Smith County." On a chilly Tuesday, October 28, 2025, Gordonsville held its community bonfire, with blankets, chairs, food, stories,

and the "burning of the Owl," a large replica of the Carthage mascot.[1] The Gordonsville Fire Department was on hand. Here's how it was promoted online:



(Facebook Post of the Community Bonfire)

10. Of course, no one wanted any Owls players literally *burned*—the burning of the Owl was a metaphor or a figure of speech.

### *Football-Rivalry Speech Is Protected by the First Amendment*

11. J.T. Summers plays running back and defensive end for the Gordonsville Tigers. His friend plays quarterback for the rival Carthage Owls.

12. The week of the big game, the Owl's quarterback made an Instagram post showing himself at quarterback and commenting "doin' it all." Outside of school hours, J.T. responded to the Instagram post with a good natured ribbing: "Love ya bro but ur time to die." J.T. included two hearts in blue and gray, the Tigers colors, precisely as shown below:

---

[1] This is a wooden owl, of course. No real owls were harmed.



13. On the morning of October 28, 2025, before townspeople gathered to hoot, holler, and burn the Owl, Principal Petty informed J.T. that he was expelled from school for 365 days for his Instagram post.

14. Instead of recognizing First Amendment protected-speech, Petty executed a "Notice of Suspension" clearly stating the reason for J.T.'s expulsion: "Posted a photo on Social Media of the QB from Carthage with the caption 'Love ya bro but ur time to die.'"

15. Like the burning of the owl, J.T. did not believe it was time for any Owls player to literally "*die*"—it was just a metaphor or figure of speech. That was entirely plain from context: the football picture, the "love ya bro," the Gordonsville hearts, the timing of the post, and their friendship.

## *The Custom, Policy or Practice Limiting Speech*

16. Principal Petty understood the rivalrous context of J.T.'s statement. Certainly, there was no evacuation, no instructional break, and no material and substantial disruption for the post sent outside of school hours.

17. However, Smith County Board of Education, Principal Petty, and Director Barry Smith, operate a custom, policy or practice of penalizing certain "magic words," such as the word "die" written in text messages or in social media.

18. This is not isolated to J.T. but includes multiple other high school students at Gordonsville High School too within the last few years. This includes text messages where one student tells another to "die," with multiple reports to Principal Petty, each time Petty issuing a 365-day expulsion for the offending words—regardless of hyperbole, satire, euphemism, or youthful indiscretion.

19. In truth, this custom, policy or practice is *not* required by the terms of the Board's written policy or by state law.[2] J.T. had made no true threat, substantial disruption of the school or any valid threat of mass violence. Rather, he ran afoul of the custom, policy or practice and, therefore, Principal Petty gave the 365-day expulsion to be served, without transportation, in a

---

[2] The Smith County Board of Education passed a Zero Tolerance policy, Board Policy Number 6.309. Effective July 18, 2023, Policy 6.309 establishes five offenses of "zero tolerance" carrying an automatic expulsion for 365 days: (1) bringing a firearm to school; (2) unlawful drug possession at school; (3) aggravated assault; (4) assault that results in bodily injury upon any teacher, principal, administrator, employee of school, or school resource officer; and (5) *valid* threat of "mass" violence on school property. The policy is subject to case-by-case modification by the Director of Schools. See Tenn. Code Ann. §49-6-3401(g)(B) (providing for a one year expulsion for zero tolerance that can only be modified by the Director of Schools).

vastly inferior academic and learning environment of an alternative school.[3] This removed all extracurricular activities too, including all sports, like basketball and football, each played by J.T.

20. J.T. appealed to the Disciplinary Hearing Authority. He submitted a statement from the Owls' quarterback's family showing there was no fear of violence in the "victim's" life.[4] It read: "*We as his parents chalked this up to boys being boys and nothing more than 'rivalry week' at its finest.*" Exactly—rivalry week at its finest.

21. The Disciplinary Hearing Authority gave no written decision, merely upholding the 365-day expulsion on October 30, 2025 on grounds of zero tolerance. J.T.'s appeal to Director Barry Smith, likewise, did not remove the expulsion either. Smith was provided the evidence of the Instagram post and its context. But the expulsion was upheld, again without any written decision. This was Director Smith's decision to make, his alone, treated like other zero tolerance offenses, not reviewable by the Board, having delegated final policymaking authority in this type of "zero tolerance" matter to Smith.

22. In sum, Defendants have stifled free speech under the American Constitution by substituting *literalism* for euphemism, context, jokes, hyperbole, metaphor, satire, and/or sarcasm. Defendants have become the speech police even for good-natured rivalry talk occurring outside of school. In other words, Defendants understood that J.T. did not make a true threat, but it penalized him *as if he had*—all in violation of the Constitution of the United States.

---

[3] There would be no transportation, and driving was prohibited, a necessity for J.T. because his parents work. Additionally, traditional teaching to a cohort cannot occur, as the class is disparate peers in different lessons, many online, with lessons being "sent in" from each student's school.

[4] *See Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

23. Through its lack of training and understanding of how magic words like "die" do *not* trump the First Amendment, and that context is required, the Defendants have caused great harm to J.T., a promising two-sport athlete and strong student. The expulsion has not only denied him his regular education and access to all extracurricular activities (including football, basketball), it also would have afforded J.T. a vastly inferior education, impugning his name and his integrity in the process.[5]

24. Smith County has harmed J.T.'s reputation and caused him significant stress. He wants to get back in the school and onto the fields of play. Accordingly, he files this action.

### III. LEGAL CLAIMS

#### Count 1. Section 1983 and First Amendment
#### (All Defendants)

25. The foregoing facts are incorporated.

26. The Defendants are punishing speech.

27. Smith County Board of Education, Mac Petty, individually, and Barry Smith, individually, have decided that certain words—here the statement of J.T. during rivalry week using the word "die" as a figure of speech—is quite obviously *not* a true threat (or any threat or meaningful disruption), but has punished J.T. as if it truly *were* pursuant to its custom, policy or practice. This is "zero tolerance" gone awry, a clear violation of the First Amendment free speech outside-of-school.

---

[5] Today, J.T. remains at home doing online schoolwork.

28. The Defendants punished J.T. for clearly protected speech in his off-campus Instagram post, under well-established law. No reasonable administrator could possibly believe this statement was a true threat or material disruption, given its context.

29. The Notice of Expulsion was issued without evidence of a true threat, material disruption, or substantial interference with school operations. In fact, no threat assessment team was even constituted.

30. The Defendants acted intentionally and with deliberate indifference to J.T.'s constitutional rights, growing out of the Smith County Board of Education's custom, policy and practice of zero tolerance for the word "die," one which chills student speech and mandates severe punishment for expression protected by the First Amendment.

31. The First Amendment *protects* the right to free expression. A key exception concerns "*true threats*" of violence. "[T]he 'true' in that term distinguishes [true threats] from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late.')."[6] J.T. Summers's speech, off-campus, was exactly that kind of hyperbole, or joking, about a football game rivalry. His speech was not a "true" threat or substantial disruption. Smith County Board of Education failed to train and understand the *contours* of free speech, creating practices that violate the First Amendment rather than honor it.

32. From Smith County Board of Education, Plaintiff seeks declaratory relief of First Amendment violations; injunctive relief of an immediate return to school and removal of the

---

[6] *Watts v. United States*, 394 U.S. 705, 708 (1969) in *Counterman v. Colorado*, 600 U.S. 66, 74 (2023).

disciplinary expulsion from his record; along with compensatory damages. To deter and punish the First Amendment violations, he seeks an appropriate and measured punitive damages award against Petty and Smith, as provided by law.

33. For relief, Plaintiff seeks:

   a. Declaratory relief of the Constitutional violations.

   b. Injunctive relief to include return of Plaintiff J.T. Summers to his regular school, and removal of the offending discipline from his record.

   c. Injunctive relief to include training and modeling of the correct application of First Amendment law;

   d. Compensation for humiliation, mental anguish, and damage to J.T. Summers's reputation.[7]

   e. Compensation for the costs of education while J.T. Summers is banned from school.

   f. Nominal damages for the Constitutional violation.[8]

   g. Attorneys' fees and costs. 42 U.S.C. §1988(b); 42 U.S.C. §1983.

34. A jury is demanded for all claims triable by jury.

>Respectfully submitted,
>
>/s Justin S. Gilbert
>Justin S. Gilbert
>Gilbert Law, PLLC.
>100 W. Martin Luther King Blvd, Suite 501
>Chattanooga, TN 37402

---

[7] A plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. §1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. *Smith v. Wade*, 461 U.S. 30, 52 (1983) ("Compensatory damages ... are mandatory.").

[8] *Carey v. Phiphus*, 435 U.S. 247, 266-67 (1978).

Telephone: 423-756-8203
justin@schoolandworklaw.com